IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Leigh Cullen Taylor,                    )
                                        )    C/A No.: 4:18-0593-MBS
                Plaintiff,              )
                                        )
        vs.                             )
                                        )
Andrew Saul, Commissioner of            )        **ORDER AND OPINION**
Social Security,                        )
                                        )
                Defendant.              )
_____ )

        This is an action brought pursuant to Section 205(g) of the Social Security Act (the "Act"),

codified as amended at 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the

Commissioner of Social Security ("Commissioner").

## I. PROCEDURAL HISTORY

        Plaintiff Leigh Cullen Taylor was born on December 15, 1980.[1]  Plaintiff alleges that she has

been disabled since May 5, 2013, because of bipolar disorder, generalized anxiety disorder,

borderline personality disorder, and fibromyalgia.  Plaintiff last met the insured status requirements

of the Act on March 31, 2017.[2]

        Plaintiff filed an application for a period of disability and disability insurance benefits on

January 31, 2014.  Her application was denied initially and upon reconsideration.  Plaintiff requested

a hearing before an administrative law judge ("ALJ").  The ALJ held a hearing on January 23, 2017.

On February 27, 2017, the ALJ issued a decision that Plaintiff was not disabled under sections 216(i)

_____

[1] Plaintiff died on September 24, 2018.  The case has been pursued by counsel on her behalf.

[2] To qualify for disability benefits, Plaintiff must prove that she became disabled prior to the
expiration of her insured status.  See 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a),
404.131(a)(2005)

and 223(d) of the Act.  The decision of the ALJ became the "final decision" of the Commissioner on January 9, 2018, after the Appeals Council determined that there was no basis for granting Plaintiff's request for review.  Plaintiff thereafter brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the "final decision" of the Commissioner.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Thomas E. Rogers, III for a Report and Recommendation.  On November 25, 2019, the Magistrate Judge filed a Report and Recommendation in which he recommended that the Commissioner's decision to deny benefits be affirmed.  Plaintiff filed objections to the Report and Recommendation on December 9, 2019.

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight.  The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976).  The court is charged with making a de novo determination of any portions of the Report and Recommendation to which a specific objection is made.  The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

## II.  STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one.  Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).  "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th

Cir. 1964).   Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Ebbert v. Berryhill*, Civil Action No.: 1:17-CV-193, 2018 WL 5904507, *3 (N.D.W. Va. Sept. 28, 2018)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).   If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is substantial evidence. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984)(quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must not undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ.  *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. *Ebbert*, 2018 WL 5904507, *3 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).  The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  However, the Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

## III.   DISCUSSION

### A.   The Hearing

Plaintiff testified at her hearing that she intermittently had worked as a pizza delivery driver and a cashier between 2002 and 2013.  R. 46-47.  As a pizza delivery driver she would occasionally carry up to twenty-five pounds and be on her feet approximately three hours per nine hour shift.  *Id.*

at 50-51.  Plaintiff testified that her fibromyalgia caused pain across her whole body, especially in the joints and especially in the morning.  *Id.* at 53.  According to Plaintiff she has bad days about half of the month where she cannot get out of bed or she is on the couch all day.  She has numbness, tingling, and pins and needles in her extremities every day.  *Id.* at 55.  She has essential tremors in her hands, a genetic condition that makes it difficult to eat or write.  *Id.* at 57.  Plaintiff testified that her bipolar disorder prompts extreme mood changes in certain stressful situations, and that she had difficulty interacting with coworkers or keeping on task.  *Id.* at 58-59.  Plaintiff testified that she receives medication and counseling that help.  Plaintiff testified that she had discontinued abusing substances such as alcohol, marijuana, cocaine, and crystal methamphetamine.  She currently is prescribed Synthroid, Cefixime, Tramadol, Propanol, Seroquel, Trazodone, and Depakote.  Plaintiff testified that she experienced  no side affects from the medications.  *Id.* at 63-64.

Plaintiff testified that, on a good day, she could occasionally lift twenty pounds, walk half a mile, stand for ten to fifteen minutes, and sit for "awhile."  *Id.* at 65.  She usually sleeps ten to twelve hours a night, but wakes frequently and does not feel refreshed. *Id.* at 66.  Plaintiff testified she can bathe, dress, use buttons and zippers, tie her shoes, and fix her hair.  She unloads the dishwasher and occasionally uses the stove.  She also is able to do her own laundry.  *Id.* at 67.  Plaintiff also testified that she has no bank account, but she keeps track of expenditures on her SNAP card for groceries.  She shops with her mother on Wednesdays when she is able.  She spends her time during the day on the internet.  *Id.* at 69.  She visits with friends about once a month and occasionally babysits for her best friend.  *Id.* at 71.

Plaintiff's mother, Karen Taylor, testified that, in her opinion, Plaintiff was unable to live on her own.  Mrs. Taylor testified that Plaintiff had attempted suicide on numerous occasions *Id.* at 74.

4

According to Mrs. Taylor, Plaintiff could administer most of her medications, but Mrs. Taylor administered Tramadol and Trazodone because of their addictive qualities. *Id.* at 76. Mrs. Taylor stated that Plaintiff is in pain pretty constantly. According to Mrs. Taylor, Plaintiff suffered some side effects from her medications, and she does not tolerate frustration well. *Id.* at 79-80. Mrs. Taylor testified that Plaintiff did not always follow up on assigned chores. *Id.* at 81. Mrs. Taylor stated that Plaintiff has terrible small motor skills. *Id.* at 82. Mrs. Taylor testified that Plaintiff self-medicates by spending money. According to Mrs. Taylor, Plaintiff does not always abide by rules, especially if she does not feel well, which is one-third to one-half of the time. *Id.* at 84-85.

William Wayne Stuart appeared as vocational expert. Mr. Stuart testified that the closest job to pizza delivery driver is deliverer, outside. DOT 230,667-010. Mr. Stuart testified that the job is described as light, unskilled work. The ALJ gave a hypothetical for deliverer, outside, with the following limitations:

> [N]o lifting, carrying, pushing or pulling over 20 pounds occasionally, ten pounds frequently, can stand and/or walk six hours in an eight our work day, can sit for six hours in an eight hour work day, no more than frequent overhead reaching with the bilateral upper extremities, no more than frequent balancing or climbing ramps and stairs, no more than occasional stooping, kneelinng, crouching, crawling, climbing ladders, ropes or scaffolds, no more than occasional exposure to hazards such as unprotected heights and moving mechanical parts and no more than occasionally operating a motor vehicle. Limited to work in a low stress environment.
>
> By that I mean the worker is limited to simple, routine and repetitive tasks and simple work related decisions, is not required to meet a rigid, inflexible production schedule, make complex decisions and there are no more than occasional changes in a routine work setting and any such changes should only be gradually introduced, but the hypothetical individual is able to maintain concentration, persistence and pace for periods of two hours, perform activities within a schedule, maintain regular attendance and complete a normal work day and work week. No more than occasional interactions with the general public and no more than occasional close team type interactions with coworkers.

*Id.* at 89-90.

Mr. Stuart testified that Plaintiff would not be able to perform her past work as pizza delivery driver. However, Mr. Stuart identified light, unskilled jobs that would fit the hypothetical: office helpers, of which he would estimate at least 90,000 jobs exist nationally; inspector and hand packager jobs, of which he would estimate at least 94,000 jobs exist nationally; and marker/tagger, of which he would estimate 90,000 jobs exist nationally. *Id.* at 91.

The ALJ identified a second hypothetical with the same limitations as the first, and an additional limitations of no more than frequently handling or fingering with the bilateral upper extremities. Mr. Stuart testified that the work he identified would still be available in substantially the same numbers. *Id.* The ALJ proposed a third hypothetical with the same limitations as the first hypothetical, but with the following changes:

> The lifting, carrying, pushing or pulling is reduced to only ten pounds occasiohnally and less than ten pounds frequently. The standing and/or walking is reduced to only two hours in a eight in an eight hour work day. The climbing ramps and stairs is reduced from frequent to no more than occasional and the climbing ladders, ropes or scaffolds is reduced from no more than occasional to none. No climbing ladders, ropes or scaffolds.

*Id.* at 92.

Mr. Stuart testified that some sedentary, unskilled jobs would fit the third hypothetical: order clerks, of which there would be at least 100,000 jobs nationally; table worker, of which there would be at least 125,000 jobs nationally; and hand sorter, of which there would be at least 90,000 jobs nationally. *Id.* at 93. The ALJ posited a fourth hypothetical, which was comprised of the limitations in the third hypothetical, but no more than frequent handling or fingering with the bilateral upper extremities. Mr. Stuart testified the sedentary, unskilled jobs would still be available in substantially

the same numbers.  The ALJ proposed a fifth hypothetical that encompassed the third hypothetical, but included handling and fingering to no more than occasionally.  Mr. Stuart testified that these fifth limitations would rule out the sedentary, unskilled jobs identified by Mr. Stuart.  *Id.* at 93.

The ALJ next posed a sixth hypothetical in which he asked Mr. Stuart for his opinion on:

> individuals who are off task for whatever reason.  They can't maintain concentration, persistence, and pace for two hours, for periods of at least two hours or they are going to be off task or have to take breaks that exceed the ones that are normally provided in a work environment for whatever reason.  So, hypothetical number is – if you have a hypothetical individual, regardless of any other limitations that he or she may have. If they're going to be off task 20 percent of the eight hour work day and that's in additon to the normal breaks they're provided and that is going to continue on a recurring basis.  Does that allow for any other work, even unskilled entry level work?

*Id.* at 94.

Mr. Stuart testified that, in his experience, "any time a worker exceeds 15 percent of the time being off task that's going to lead to a situation where they're not job ready for any kind of placement.  That is, there's not a job that would match that."  *Id.*

The ALJ posed a seventh hypothetical:

> Again, drawing here on the limitations here she may have – if they're going to be absent from work two days per month or more and that's going to continue on a reoccuring basis, does that allow for any other work, even unskilled work, entry level work?

*Id.*

Mr. Stuart responded that there would be no job to match the seventh hypothetical.  *Id.*  He also testified that, in his experience, a worker cannot miss more than one or one and a half day per month on a recurring basis.  *Id.* at 95.

B.    Medical Records

As the ALJ and Magistrate Judge noted, extensive medical records were provided by Plaintiff

regarding her mental and physical health issues prior to her onset date in 2013. The Magistrate Judge recited Plaintiff's treatment in the February-March 2013 time period. These records are largely consistent with Plaintiff's symptoms and impairments after the onset date. For example, one of Plaintiff's treating physicians, James F. Riddle, M.D., submitted a letter to Plaintiff's counsel on April 20, 2017, in which he noted that Plaintiff had been receiving psychiatric treatment since the age of 15 and had been hospitalized for psychiatric treatment several times. R. 9. The court will focus on Plaintiff's records commencing in May 2013.

      1.    <u>James H. Altieri, M.D.</u>  Plaintiff presented to Dr. Altieri of the Spring Valley Family Practice on May 23, 2013, with ear complaints and frequent urination. She was provided amoxicillin to treat both conditions and was advised to utilize an antihistamine and decongestant. On November 27, 2013, she return to Spring Valley Family Practice and was assessed for acute urinary tract infection. She was prescribed Ciprofloxacin HCI. On December 5, 2013, Plaintiff presented complaining of frequent urination and cramping. She was diagnosed with urinary tract infection and vaginitis. Plaintiff was treated with Fluconazole and Nitrofurantoin Monohyd Macro. R. 502-510.

      On February 24, 2014, Plaintiff presented to Dr. Altieri after having overdosed on Seroquel and Depakote and requiring a four day stay in the hospital. Plaintiff denied this was a suicide attempt. Dr. Altieri noted that Plaintiff had a history for prior suicidality and attempts to hurt herself, as well as a history for fibromyalgia and chronic narcotic dependence. Her prescriptions for depression (Seroquel), fibromyalgia (Oxycodone), and migraine headache (Propranolol) were renewed. Dr. Altieri stopped Plaintiff's Ropinirole for restless leg. On March 10, 2014, Plaintiff presented with her mother after overdosing on Soma, taking 14 pills in a 47-hour timeframe. Dr. Altieri stopped Plaintiff's Carisoprodol and Oxycodone. *Id.* at 497-509.

On July 10, 2014, Plaintiff was examined for problems with progressive pain in the left knee. She reported that in 2000 she had an accident where she needed surgery to repair her pelvis and femur was rodded and pinned. Plaintiff was started on Diclofenac Sodium. *Id.* at 584-585. On August 1, 2014, Plaintiff presented for concerns over anxiety and panic. She reported that her father had left for four days and blamed her when he returned. She was evaluated at the emergency room on Monday and Tuesday. Dr. Altieri increased Plaintiff's dosage of Seroquel, started her on Gabapentin and Tramadol for fibromyalgia, and stopped her prescription for Trazodone. *Id.* at 580-583. On August 15, 2014, Plaintiff returned, complaining of widespread pain and difficulties with her mood. Dr. Altieri recorded that Plaintiff had been prescribed Valium by her psychiatrist for anxiety but misused a substantial amount, causing her excessive sleepiness, speech slurring, falling down stairs, and memory loss. A urine drug screen performed at the emergency room had shown positive for benzodiazepines. On August 26, 2014, Plaintiff presented in crisis, stating that she could not go home because she did not feel safe. Plaintiff stated that she was overwhelmed by the negative interactions in her home environment, especially with her father. Plaintiff agreed to seek help at the emergency room because she did not feel safe and self harm was possible. *Id.* at 574-576.

On September 10, 2014, Plaintiff reported frequent urination, excess sleepiness, struggles with bipolar depression and borderline personality issues that made her prone to rages and impulsive behaviors. Dr. Altieri observed that Plaintiff's impulsive behaviors previously had played out by mutiple suicide attempts through overdose and once by cutting her neck with a box cutter. Dr. Altieri also noted Plaintiff's longstanding history for polysubstance abuse. Plaintiff was started on Ciprofloxacin for a urinary tract infection. Dr. Altieri commented he would recommend an inpatient setting for more intensive medication and psychotherapy interventions. *Id.* at 570-573.

9

Dr. Altieri completed a form for Plaintiff's attorney on August 2, 2016. Dr. Altieri recorded that Plaintiff had a history of widespread pain for three or more months; pain in eleven or more pressure points; stiffness, sleep disturbance, chronic fatigue, and memory loss. Dr. Altieri opined that Plaintiff could work no hours per day. Dr. Altieri opined that Plaintiff could stand for thirty minutes at a time, stand two hours in a workday, sit for sixty minutes at a time, sit for two hours during a workday, lift ten pounds occasionally and five pounds frequently; occasionally bend and stoop; and frequently raise her arms over shoulder level. Dr. Altieri commented that both physical and cognitive effects from the fibromyalgia made Plaintiff unable to remain gainfully employed. *Id.* at 794.

2.    <u>Dr. Kendall</u>. Plaintiff was seen by Edward M. Kendall, M.D. on May 22, 2013. Plaintiff stated that she had been fired from her job for an altercation with a coworker. Plaintiff reported that she remained friends with her coworker and former boss. Plaintiff stated that she had a job offer. Dr. Kendall noted that Plaintiff presented as cheerful and having had an adaptive response to the job loss. She was give a global assessment of functioning (GAF)[3] score according to Axis V (GAF self-report) of 60. R. 697-699.

On July 18, 2013, Plaintiff presented with mild agitation and profane speech. Plaintiff stated she was going crazy, living at home was like being in jail. Plaintiff complained that her twenty-seven year old brother had never worked but was fully supported by their parents. Plaintiff stated that she did not have money to complete ADSAP to get her driver's license back. Dr. Kendall

---

[3] The Global Assessment of Functioning, or GAF, scale is used to rate how serious a mental illness may be. It measures how much a person's symptoms affect his or her day-to-day life on a scale of 0 to 100. It is designed to help mental health providers understand how well the person can do everyday activities. https://www.webmd.com/mental-health/gaf-scale-facts (citing Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition) (accessed April 16, 2020).

described Plaintiff as irritable and anxious. According to Dr. Kendall, Plaintiff had been free of alcohol for two years and had quit using marijuana. Dr. Kendall reported that Plaintiff was very frustrated with labile mood, primarily because she had no job, had conflict with family, and felt unequally treated compared to her brother. Plaintiff denied suicidal ideation. Plaintiff's Valium was increased with a plan to taper later when stress lessened. Plaintiff was assigned a GAF score of 55. *Id.* at 694-696.

Plaintiff was seen by Dr. Kendall on September 12, 2013. Plaintiff stated that she was doing better than her last visit. Plaintiff reported that her mood was reasonably good, she had no suicidal ideation, no agitation. Plaintiff reported being frustrated at her circumstances, inability to find a job, and need to get her driver's license back. Plaintiff reported remaining drug free except for marijuana. Dr. Kendall and Plaintiff discussed at length her previous binge drinking. Plaintiff reported that overall her current prescriptions were effective. Dr. Kendall reported that Plaintiff would be assigned a new physician because of his pending retirement. Plaintiff was assigned a GAF score of 60. *Id.* at 691-693.

3.    Dr. Coshal. Plaintiff was referred to Balbir S. Coshal, M.D. after Dr. Kendall's retirement. Dr. Coshal was informed on February 19, 2014 that Plaintiff had been admitted to the hospital for four days because her Depakote level was elevated. On February 20, 2014, Dr. Coshal reviewed Plaintiff's discharge papers, which indicated Plaintiff's father brought her to the emergency room after she was found unresponsive. She was given Narcan to help rouse her because of a critical respiratory rate of 4-6 breaths per minute. Plaintiff vomited pill fragments that she described as Sweet Tarts, but the fragments were possibly Levothyroxine or Lortab. R. 728.

Plaintiff met with Dr. Coshal on February 21, 2014. Dr. Coshal reported that Plaintiff had

been admitted to the intensive care unit after being found unresponsive. According to Dr. Coshal, Plaintiff probably took an overdose of opiates and benzos. She had two unlabeled bottles of morphine sulphate that had not been prescribed to her. Plaintiff denied taking an overdose, stated she was admitted to the hospital because of elevated liver enzymes. Dr. Coshal observed that perhaps Plaintiff was in denial. Plaintiff stated she was being prescribed oxycodone for fibromyalgia because it is cheaper than Lyrica. Dr. Coshal noted that "[s]urprisingly she looks well. She is in a cheerful mood and is smiling. She is pleasant to relate to." Plaintiff received a GAF score of 50. *Id.* at 688-690.

Plaintiff was seen by Dr. Coshal on May 21, 2014. She reported she was mostly doing fair. According to Plaintiff, anxiety was bothering her, she had trouble falling asleep because her mind kept going. *Id.* at 537-538. Plaintiff had a GAF score of 45. *Id.* at 601-602. Plaintiff presented on August 4, 2014. She reported she had been in the emergency room three times the last week. She reported that she had a fight with her father and that he was gone for four days. Plaintiff stated she had a nervous breakdown. Plaintiff stated she received a shot of Ativan, and that the physician gave her a script for Xanax 2 mg 4 times a day. There was no record of a prescription in the emergency room papers. Dr. Coshal assigned Plaintiff a GAF score of 45. *Id.* at 597-598.

On September 4, 2014, Plaintiff was seen again by Dr. Coshal. She stated she fell from stairs and hit the right side of her head, making a hole in the wall. Plaintiff appeared lethargic and somnolent. She responded to questions properly. Her pupils did not react to light. Her appearance was unkept. She denied suicidal ideation. Plaintiff as assigned a GAF of 40. She was transported to the hospital via ambulance. *Id.* at 592-593.

4.      <u>Mr. Taylor</u>. Plaintiff's father, R. Frederick Taylor, completed a function report on

March 2, 2014.  Mr. Taylor reported that during the day Plaintiff took her medicine, went online to check with her friends, smoked, ate, attended medical appointments, watched televison or used her laptop, and slept.  Mr. Taylor reported that Plaintiff was unable to sleep at night; that she needed no problem with personal care, including no reminders to take care of her personal needs and grooming or medication; that she did not prepare her own meals but usually warmed up prepared foods.  Mr. Taylor stated that Plaintiff had been banned from cooking at night because she had serious accidents while preparing food on the stove.  Mr. Taylor reported that Plaintiff did laundry once a week and occasionally needed to be reminded to do her laundry.  According to Mr. Taylor, Plaintiff did not do house or yard work because of her illnesses and lack of drive.  Mr. Taylor reported that Plaintiff went outside daily and shopped for clothes, medicine, and personal items on her computer.  Mr. Taylor reported that Plaintiff could not handle money and spent every cent she got.  Mr. Taylor stated Plaintiff's hobbies and interests included watching television, browsing the internet, and reading, but she no longer participated in sports or attended sporting events.  Plaintiff spent time with others through her phone and computer.  Mr. Taylor stated that Plaintiff had problems with anger, use of substances, and keeping her room clean that had intensified.  Mr. Taylor stated that, as Plaintiff's illnesses had progressed, she had problems lifting, walking, stair climbing, understanding, squatting, following instructions, bending, kneeling, memory, using hands, completing tasks, getting along with others, and concentration.  R. 255-262.

     5.    <u>Plaintiff</u>.  Plaintiff also filed out a function report on March 2, 2014.  Plaintiff stated that during the day she took medication, checked the news online, ate meals prepared for her, went to medical appointments; watched television, and slept.  Plaintiff reported difficulty sleeping but no problems with personal care.  She reported that her family would not allow her to prepare meals; that

she did no house or yard work because she could not focus or finish tasks; and that she needed constant reminders and assistance to complete household chores.  Plaintiff stated that she went outside several times a day; was unable to drive because of drugs for pain, tremors, and mental condition; and that she shopped for small personal items in stores whenever her family would take her.  Plaintiff reported that she did not trust herself with money.  Plaintiff reported watching sports as a hobby and that she previously had participated in sports before her conditions began.  Plaintiff stated she spent time with her brother.  Plaintiff also stated that she had problems getting along with her family because of anger, mood swings, and poor communication.  She reported issues with lifting, walking, stair-climbing, understanding, squatting, following instructions, bending, kneeling, memory, using hands, standing, completing tasks, getting along with others, and concentration.  Plaintiff reported that she had serious problems with focus/attention, could not follow written instructions, could not follow spoken instructions well because she could not remember, and did not handle stress or change in routine well.  Plaintiff also noted an unusual fear of family.  Plaintiff further stated: "Please speak with my doctors.  I had help to fill out this form and he only wrote down what I said."  R. 264-271.

Plaintiff completed another function report on November 11, 2014.  Plaintiff stated that her mental illnesses made working with customers difficult, while her fibromyalgia made it hard to do manual activities.  She further stated that her essential tremors made any small motor skills extremely difficult.  She stated she had trouble focusing on anything and had to be constantly reminded to do simple things that she wished she could remember.  Plaintiff reported that she used to be able to take care of herself and live independently; that she used to see friends but she did not any more.  Plaintiff stated that she found it hard to fall asleep and stay asleep; that she had trouble

using a fork or spoon; that she did not do house or yard work because it was too painful and she got frustrated and upset; that she shopped in stores briefly once a week because she did not want to be around people; that she did not trust herself to handle money; and that her hobbies included reading, watching sports, and watching movies. According to Plaintiff, she experienced trouble with her father, could not go out because of pain and motivation; did not get along well with authority figures; could not handle stress and changes in routine; and had unusual bouts of crying, starting arguments, and hiding in her room. Plaintiff stated that, "[e]ven with meds and docs, I still am getting no better and can't take care of myself." R. 283-290.

6.      Dr. Riddle. James Frank Riddle, M.D. completed a mental residual functional capacity (RFC) questionnaire on June 10, 2014. Dr. Riddle indicated that Plaintiff continued to have difficulty with anxiety and dealing with stress. He stated that medications had improved her mood somewhat and that she reported using alcohol and marijuana about once a month. With respect to Plaintiff's mental abilities and aptitudes needed to do unskilled work, Dr. Riddle reported that Plaintiff had unlimited or very good ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain ordinary routine without special supervision, make simple work-related decisions, and ask simple questions or request assistance; limited but satisfactory ability to maintain attention for two hour segments, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes and respond appropriately to changes in a routine work setting; was seriously limited, but not precluded, from maintaining regular attendance and being punctual within customary, usually strict tolerance, dealing with normal work stress, and being aware of normal hazards and taking appropriate action; and was unable to meet competitive standards with respect

to working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods.  R. 675-76.

Regarding unskilled work, Dr. Riddle determined Plaintiff had limited but satisfactory ability to understand and remember detailed instruction, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places; seriously limited, but not precluded, ability to carry out detailed instructions, set realistic goals or make plans independently of others, interact appropriately with the general public, and to use public transportation.  Dr. Riddle determined that Plaintiff was unable to meet competitive standards with respect to dealing with stress or semiskilled and skilled work.  *Id.* at 673-677.

Dr. Riddle completed a second mental RFC questionnaire on July 27, 2016.  Dr. Riddle stated that Plaintiff continued to have difficulty with anxiety and dealing with stress.  According to Dr. Riddle, Plaintiff's medications had improved her mood a little.  Plaintiff reported using alcohol once a month and marijuana every three months.  She also reported having two or three panic attacks per week.  Dr. Riddle stated that Plaintiff had fatigue but this could be due to fibromyalgia or a side affect of Seroquel and Tramadol.  Dr. Riddle recounted that Plaintiff reported trouble sleeping, severe anxiety, difficulty dealing with stress, decreased energy, low motivation, and feeling paranoid around other people.  With respect to Plaintiff's mental abilities and aptitudes needed to do unskilled work, Dr. Riddle reported that Plaintiff had unlimited or very good ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, and ask simple questions or request

assistance; limited but satisfactory ability to maintain attention for two hour segments, sustain ordinary routine without special supervision; was seriously limited, but not precluded, from maintaining regular attendance and being punctual within customary, usually strict tolerance, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, and was unable to meet competitive standards with respect to working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and dealing with normal work stress.  Dr. Riddle further determined that Plaintiff had limited but satisfactory ability to understand and remember detailed instructions; was seriously limited, but not precluded in her ability to carry out detailed instructions, set realistic goals or make plans independently of others; and was unable to meet competitive standards in dealing with stress or semiskilled and skilled work.  In addition, Dr. Riddle found that Plaintiff had limited but satisfactory ability to adhere to basic standards of neatness and cleanliness; that she was seriously limited, but not precluded in her ability to interact appropriately with the general public, maintain socially appropriate behavior, and travel in unfamiliar places; and was unable to meet competitive standards in using public transportation because of her paranoia. *Id.* at 782-788.

7.     Dr. Taylor. On September 2, 2014, Plaintiff was evaluated by Cherilyn Y. Taylor, Ph.D. Plaintiff reported essential tremor disorder, fibromyalgia, hypothyroidism, and diverticulitis. She reported two DUIs in 2007.  Plaintiff admitted to smoking since age sixteen and that she currently smoked about a pack a day.  Plaintiff stated that she had begun drinking at age twelve and

drank heavily for five years and twice enrolled in a dual diagnosis treatment program for seven days to address her alcohol abuse issues. Plaintiff reported approximately six to seven psychiatric hospitalizations between the early 1990s and 2009 for manic-depressive episodes and suicide attempts. Plaintiff indicated that her psychiatric visits would last for between two days and ten days each time she was admitted. Plaintiff stated that she was seeking voluntary inpatient admission at a long-term psychiatric facility to receive treatment for mood dysfunction, including suicidal ideation. Plaintiff reported that she was able to bathe, dress, and use the toilet independently when motivated. Plaintiff also stated that she was capable of preparing basic meals, doing laundry, and performing housework. Plaintiff stated that her driver's license was suspended until she completed a class for her DUIs, but she could not afford the $750.00 fee for the class.

Dr. Taylor reported that Plaintiff was cooperative and put forth a good effort throughout the evaluation. She did not manifest any bizarre behavior; her thought processes were essentially within normal limits; and Plaintiff denied both past and present homicidal ideation and relayed no history of previous attempts. Plaintiff was alert and oriented to time, place, and day of the week. She demonstrated no pain behavior, psychomotor agitation, or retardation during the interview. Her intellectual functioning was estimated to be in the average range. Plaintiff obtained a score of 30/30 on the Folstein Mini-Mental State Examination,[4] which placed her well within average limits. Plaintiff demonstrated good insight and judgment as related to both simple and more complex tasks. Plaintiff was able to track the flow of conversation adequately across the forty-five minute interview and did not show distraction by ambient sounds. Plaintiff also reported that she was sexually abused

---

[4]The Folstein Mini-Mental State Examination is a short screening tool for providing an overall measure of cognitive impairment in clinical, research, and community settings. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6464748/ (accessed April 16, 2020)

at the age of twelve and was unable to have children as a result.  Plaintiff relayed a history of verbal and mental abuse by her father, and that she became extremely anxious in social situations.  Plaintiff reported that she went out with her girlfriends once a month but otherwise spends most of her time at home in her room surfing the internet.  R. 648-651.

8.      Dr. McWilliams.  Junko McWilliams, Ph.D. completed a Disability Determination Explanation for the Social Security Administration on September 8, 2014.  Dr. McWilliams recounted Plaintiff's family and medical history.  Dr. McWilliams found that Plaintiff had impairments of affective disorders (12.04) and substance addition disorders (12.09) that did not precisely satisfy the diagnostic criteria of the listings. Dr. McWilliams found under affective disorders that Plaintiff had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no reported episodes of decompensation for an extended duration. Dr. McWilliams opined that Plaintiff's medically determinable impairments reasonably could be expected to produce her pain or other symptoms; that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone; that Plaintiff's activities of daily living were the most informative in assessing the credibility of Plaintiff's statements; and that Plaintiff was partially credible.  Dr. McWilliams reported a RFC as follows: Plaintiff could lift fifty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for more than six hours on a sustained basis in an eight-hour workday; had unlimited ability, other than shown, for lift and/or carrying, and in climbing ramps/stairs; could frequently climb ladders/ropes/scaffolds; had unlimited ability to balance; could frequently stoop; had unlimited ability to kneel, crouch, and crawl.  As to a mental RFC, Dr. McWilliams found that Plaintiff had

no understanding and memory limitations. Dr. McWilliams determined that Plaintiff had sustained concentration and persistence limitations as follows: was not significantly limited in the ability to carry out very short and simple instructions; was moderately limited in the ability to carry out detailed instructions; was not significantly limited in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions. Dr. McWilliams found that Plaintiff was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. McWilliams opined that Plaintiff could perform the simple mental demands of competitive work and could carry out up to three-step instructions. Dr. McWilliams found Plaintiff to be limited to unskilled work and that there were a significant number of jobs that exist in the national economy (83-14 Other work with combined impairments). In Dr. McWilliams's view, Plaintiff was not disabled. *Id.* at 105-111.

9.     Dr. Cochran. Barbara Cochran, M.D. completed an analysis for the Social Security Administration on September 9, 2014. Dr. Cochran noted that Plaintiff was diagnosed with fibromyalgia but that she was not sure why because no tender points examination was in the record. Dr. Cochran opined that, with Plaintiff's ongoing psych issues, it was far from clear that Plaintiff actually had fibromyalgia. Plaintiff was given the benefit of the doubt, however. Dr. Cochran found that Plaintiff's thyroid, obesity, essential tremor, migraine were nonsevere impairments both singly and in combination, and that the fibromyalgia was a severe impairment that did not meet or equal

a listing.  R. 104.

10.    <u>Columbia Area Department of Mental Health</u>. On December 17, 2013, staff was notified that Plaintiff had presented to the emergency room intoxicated, angry, and out of control. Hospital staff reported that Plaintiff had to be placed in soft restraints.  Hospital staff also reported that, according to EMS workers, Plaintiff was so disorderly while in a cab she was put out onto the street.  She was evaluated on December 18, 2013.  Plaintiff reported drinking "plenty" the night before celebrating a friend's birthday.  She also reported smoking marijuana one to two weeks prior. Plaintiff was alert and oriented, mood was angry, affect was one of frustration.  She denied suicidal ideation, depression.  Plaintiff was anxious to return home.  R. 735.

Plaintiff presented on August 1, 2014 to pick up Seroquel.  Plaintiff's appointment with the case manager was not scheduled until August 4, 2014.  Plaintiff became upset that she could not be seen and stated she would return to the emergency room to get help.  Plaintiff requested a prescription for Xanax or Valium.  Plaintiff eventually calmed down and confirmed that she would appear for her appointment. Plaintiff was released stable but noted with increased anxiety and periods of crying.  R. 561.  On August 4, 2014, Plaintiff kept her appointment and was evaluated by Cheryl A. Johnson, M.A.  Plaintiff reported that she was stable on medications but continued to frequent emergency rooms up to five times monthly.  She stated she  was seeking a safe haven from issues with her father.  She complained that her brother was allowed to live in the home with no form of employment while her parents complained that she did not work.  Plaintiff reported that she enjoyed delivery services until her fibromyalgia became too painful.  Plaintiff reported that she sought out physicians to assist with pain management. Ms. Johnson reported that Plaintiff had been known to be transported by ambulance for overdoses of opiate and/or benzos, and for having

unlabeled bottles of morphine sulphate that were not prescribed to her.  Plaintiff denied overtaking her medication and medication of others.  Plaintiff reported that her mood was reasonably good but she was frustrated by her circumstances, the need for employment and/or disability benefits.  Plaintiff reported that her tremors would not allow her to wait or bus tables or sit for long periods of time without discomfort. Plaintiff stated that she felt and did well with medication compliance.  Plaintiff reported her mood as reasonably good with no suicidal ideation, no agitation. Ms. Johnson opined that Plaintiff appeared to have an understanding of her illness with little clarity as to the consequences of her substance dependence.  Plaintiff was focused on the behavior of her father and the response of her mother.  Plaintiff was assigned a GAF score of 50.  *Id.* at 559-560,

On August 12, 2014, Mrs. Taylor called and informed the clinic that Plaintiff had taken 60 Valium tablets between August 4, 2014 and August 9, 2014.  She reported that she took Plaintiff's medications and would be distributing them to Plaintiff.  *Id.* at 556.  On August 14, 2014, Plaintiff called and turned the telephone over to her parents.  Mrs. Taylor reported that Plaintiff was incoherent and sleeping a lot, and that she had been seen in the emergency room that morning but was discharged.  Mrs. Taylor was informed that the Valium prescription had been cancelled.  *Id.* at 553.

On August 15, 2014, Plaintiff and Mrs. Taylor appeared for an appointment with Plaintiff's case manager.  Mrs. Taylor explained that Plaintiff had been slurring her speech, dropping things, had fallen down the stairs, and was incoherent at times.  Mrs. Taylor had been advised by Plaintiff's physician to call an ambulance. At the appointment, Plaintiff rejected treatment options.  Plaintiff denied suicidal ideations, delusions, and paranoia.  Plaintiff admitted to issues with chronic pain management and that she felt depressed with her pain and anxious over her mother medicating her

"at her leisure." Plaintiff was referred to Dr. Coshal. *Id.* at 552.

On August 26, 2014, Plaintiff called the clinic and reported feeling suicidal. Plaintiff reported that she had been held overnight at the emergency room but discharged. Plaintiff refused to appear in person to be assessed. It was noted that Plaintiff was not progressing with treatment and showed signs of decompensation. *Id.* at 546. The same day, Mrs. Taylor reported that Plaintiff had been seen by her physician, who returned her to the emergency room. *Id.* at 545. On August 27, 2014, Mrs. Taylor reported that Plaintiff was held overnight at the hospital and that the physician who assessed Plaintiff thought Plaintiff was malingering. *Id.* at 544. On August 28, 2014, Mrs. Taylor was informed that Plaintiff had kept her appointment but had refused to wait to be assessed. Mrs. Taylor was informed that, based on Plaintiff's reports of sleeping with a knife under her pillow, a detention order was needed. *Id..* at 542. That same day, Plaintiff and Mrs. Taylor were informed that the detention order would not be issued if Plaintiff would agree to verbalize any suicidal ideation. *Id.* at 541. On August 29, 2014, Mrs. Taylor reported that Dr. Altieri had been able to assess Plaintiff and that Plaintiff was calm. *Id.* at 540.

On September 4, 2014, Plaintiff was brought to the clinic by a family member. Plaintiff reported falling through the plaster in the wall at her house after she lost her footing. Plaintiff hit the right side of her face on the wall and hurt her knees and two fingers on her left hand. Plaintiff's pupils were nonreactive and fixed, speech slow. Plaintiff denied overdose of any meds or substance use. She did not smell of alcohol. Dr. Coshal was in the office to check Plaintiff's pupils as well and to ask questions. Plaintiff was transported from the clinic by ambulance. *Id.* at 591. Plaintiff was assigned a GAF score of 40.

On September 8, 2014, Plaintiff was offered outpatient services. Plaintiff refused, stating

this would not benefit her because she was wanting to get out of her home environment.  *Id.* at 604.

On September 9, 2014, Plaintiff reported to the clinic that she sought services for chronic pain and

suicidal ideation through hospitals in the Irmo, South Carolina, area.  Plaintiff indicated a desire to

discuss long-term inpatient treatment.  *Id.* at 539.  On September 11, 2014, Plaintiff called and stated

she was out of Cymbalta and Seroquel.  She was told she could pick up enough samples to get her

through until her next appointment.  *Id.* at 603.

Plaintiff was assessed for acceptance into the Suicide Prevention Program (SPP) on October

7, 2014.  Plaintiff was cooperative, maintained good eye contact, and made it clear she was interested

in an inpatient setting.  Plaintiff complained that her father was emotionally abusive and bipolar.

According to the assessment, Plaintiff stated her last suicide attempt was in 2010, while records from

2014 report that Plaintiff had made sixteen suicide attempts.  Plaintiff reported that she had slit her

throat once with a box cutter, requiring over 200 stitches.  The assessment noted that the emergency

room records indicated doctors had elected to keep the wound open.  Plaintiff admitted to an

extensive history of substance abuse but stated she currently abused only marijuana and alcohol.

Plaintiff reported being raped at age twelve by an unknown perpetrator.  Plaintiff stated she had

negative ruminating thoughts, wishing she would have done things differently as a child.  Plaintiff

denied paranoia or hallucinations, and stated that her concentration was pretty good.  Plaintiff

admitted a history of cutting when she was a teenager.  Plaintiff's impulsive behavior included

shoplifting, spending money, promiscuous behaviors, and drug use.  *Id.* at 669.

On October 13, 2014, Plaintiff presented requesting help dealing with her parents, mainly

her father.  Plaintiff stated that she was bipolar and had physical problems and it was hard to get

transportation around.  She reported sleeping better with Seroquel and Trazadone, she still would

get up off and on.  She reported that her appetite was good and her weight was up and down.

Plaintiff denied hearing voices.  Plaintiff stated her depression was five on a scale of ten and that she

had been doing better the last several weeks.  Plaintiff described her mood as "middle of the road,"

not much irritability.  Plaintiff was cooperative; calm; had normal speech; intact associations;

logical/goal related thought process; and denied delusions, suicidal ideation, homicidal ideation,

obsessions, hallucinations.  Plaintiff's mood was depressed and irritable; her affect was appropriate;

she was alert and oriented to time, place, person, and circumstances.  Her recent and remote memory

and concentration were intact; her language was average; judgment and insight fair; and her fund of

knowledge average.  She received a GAF of 45.  *Id.* at 661.

On October 28, 2014, Plaintiff reported that she had been doing okay.  Plaintiff was looking

forward to handing out candy for Halloween and the holidays.  Plaintiff stated that her father had

been more "mellow" and she believed it was because he had gotten paid by a client.  Plaintiff

reported a good relationship with her mother and brother.  Plaintiff agreed to attend her first SPP

meeting the next day and was told she could learn some new positive coping skills.  *Id.* at 665.

Plaintiff actively participated in the meeting on October 29, 2014.  *Id.* at 664.

11.    <u>Dr. Hammonds</u>.  Michael Hammonds, Ph.D. completed a Disability Determination

Explanation for the Social Security Administration on January 7, 2015.  Dr. Hammonds noted that

Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's

pain or other symptoms.  Dr. Hammonds found that Plaintiff's statements about the intensity,

persistence, and functionally limiting effects of the symptoms were not substantiated by the objective

medical evidence alone.  Dr. Hammonds found Plaintiff's activities of daily living and medication

treatment to be most informative in assessing the credibility of Plaintiff's statements, and that

Plaintiff's statements were partially credible.   According to Dr. Hammonds, Plaintiff could occasionally lift and/or carry fifty pounds in an eight-hour day, frequently carry twenty-five pounds, stand and/or walk for about six hours in an eight hour day; sit for more than six hours on a sustained basis in an eight-hour day.  Dr. Hammonds found that Plaintiff had unlimited, other than shown, ability to lift and/or carry; unlimited ability to climb ramps/stairs; frequent ability to claim ladders/ropes/scaffolds; unlimited ability to balance; frequent ability to stoop; unlimited ability to kneel, crouch, and crawl.  Dr. Hammonds opined that Plaintiff had no understanding and memory limitations; was not significantly limited in carrying out very short and simple instructions; was moderately limited in her ability to carry out detailed instructions; was not significantly limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, or to make simple work-related decisions; and was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Hammonds found Plaintiff to be moderately limited in her ability to interact appropriate with the general public; not significantly limited in her ability to as simple questions or request assistance; moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors; and not significantly limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Dr. Hammonds opined that Plaintiff was moderately limited in her ability to respond properly to changes in the work setting; and not significantly limited in her ability to be

26

aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Dr. Hammonds determined that Plaintiff was limited to unskilled work and that there are a significant number of jobs that existed in the national economy (83-14 Other work with combined impairment). Accordingly, Dr. Hammonds deemed Plaintiff to be not disabled, finding that Plaintiff would be able to maintain attention and concentration for two hours at a time as required to perform simple tasks; that Plaintiff was capable of appropriate social interaction with coworkers and supervisors but would do best in an environment that did not require ongoing public contact; that supervision should be direct and nonconfrontational; that her work environment required simple, repetitive tasks. R. 118-126.

12.    Dr. Walker. George Walker, M.D. made a determination of not disabled for the Social Security Administration on January 7, 2015. Dr. Walker opined that Plaintiff's condition resulted in some limitations in her ability to perform work-related activities, but was not severe enough to keep her from working. R. 127-128.

13.    Drs. Goldstein and Malone. Plaintiff was evaluated by Francis P. Goldstein, M.D. on September 28, 2016, after Plaintiff was admitted to the hospital for psychotic behavior. Dr. Goldstein noted that Plaintiff was alert and oriented and in no acute distress. She was cooperative with appropriate mood and affect. Plaintiff tested positive for benzodiazepines, cocaine metabolites. Dr. Goldstein diagnosed Plaintiff with Bipolar I disorder with mood-congruent psychotic features, elevated blood pressure, hypothyroidism, fibromyalgia, tremor, and stated that "[o]bviously the positive test for cocaine will need to be addressed." R. 798-800.

A psychiatric evaluation was conducted the same day by Timothy D. Malone, M.D. Dr. Malone reported that Plaintiff had a history of bipolar disorder and borderline personality disorder

27

who had been seen two days in a row in an emergency room due to physical problems and associated anxiety regarding learning that her father was dying from cancer. Although Plaintiff reportedly presented herself as a risk of harm to self, at the time of the examination Plaintiff denied feeling suicidal or homicidal; however, she was emotionally labile and unable to stop crying and sobbing loudly. Plaintiff reported feeling helpless and hopeless and was asking for help. Plaintiff minimized her behavior in cutting her throat and overdosing. Plaintiff denied substance abuse despite testing positive for cocaine. Plaintiff was admitted to the adult unit at the hospital and placed under observation. Plaintiff was placed on medicines to help stabilize her mood and conduct, and was to work on developing coping strategies. On October 3, 2016, Dr. Malone was informed that Plaintiff was feeling better and had been participating appropriately in groups. Plaintiff denied any thoughts of harming herself or others, was sleeping fairly well, and interacting appropriately with peers and staff. Plaintiff was cooperative and exhibited the appropriate mood and affect, had normal judgment, and was nonsuicidal. Plaintiff was calm and her thought process was appropriate. *Id.* at 801-810.

C . The ALJ's Decision

Based on this and other evidence appearing in the record, the ALJ determined that Plaintiff had the following severe impairments: bipolar disorder, generalized anxiety disorder, borderline personality disorder, and fibromyalgia. The ALJ stated that the severity of Plaintiff's physical impairments, considered singly and in combination, did not meet or medically equal the criteria of any listing. The ALJ determined that the record failed to establish fibromyalgia as an impairment of listing level severity, because the available medical evidence did not contain the requisite clinical, laboratory, or radiographic findings. The ALJ also determined that the severity Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of

28

of any impairment listed in section 12.00 of Appendix 1 (mental disorders).  The ALJ specifically considered paragraph B,[5] noting that the mental impairments must result in extreme limitation of one, or marked limitation of two, of the four areas of mental function.  The ALJ observed that the four areas of mental functioning are: understand, remember, or apply information; interact with others; concentrate, persist or maintain pace; and adapt or manage oneself.

The ALJ found that Plaintiff had moderate limitation in understanding, remembering, or applying information.  The ALJ noted that Plaintiff reported problems with understanding, remembering, concentrating, following instructions, and completing tasks; however, Plaintiff could attend to personal care and perform tasks like doing laundry and going shopping.  The ALJ noted that Plaintiff obtained a perfect score on the Folstein Mini-Mental State Examination and exhibited good insight and judgment in relation to both simple and more complex tasks.  The ALJ observed that Plaintiff did not exhibit any obvious problems at the hearing with respect to understanding or responding to questions.  The ALJ further noted that Plaintiff could keep track of her SNAP card and used a laptop computer to access the internet and spend time on social media.

The ALJ found that Plaintiff had moderate limitation in interacting with others.  The ALJ

---

[5] "Paragraph B of each listing (except 12.05) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see §§ 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 12.05.)"  Appendix 1–Part–A2. to Subpart P of Part 404–Listing of Impairments.

noted that Plaintiff reported problems getting along with others. The ALJ observed that Plaintiff could go outside, shop in stores, attend medical appointments, and spend time with others. The ALJ stated that Plaintiff seemed pleasant and cooperative during a psychological consultative examination, and that she reported use of social media and occasional visits from friends.

The ALJ also found that Plaintiff had moderate limitations with regard to concentrating, persisting, or maintaining pace. The ALJ noted that Plaintiff stated she required reminders and encouragement to perform household chores. The ALJ further noted that at a consultative examination, Plaintiff acknowledged an ability to perform most activities of daily living when motivated and could adequately track the flow of conversation during the course of the evaluation. The ALJ noted that, at the hearing, Plaintiff demonstrated adequate ability to understand and respond to questions.

The ALJ further found that Plaintiff had moderate limitations in adapting or managing oneself. The ALJ noted that, although Plaintiff stated she could no longer take care of herself or live independently, she could attend to personal care, could prepare basic meals, and do laundry and some housework. The ALJ also noted that, at a consultative examination, Plaintiff exhibited good insight and judgment in relation to both simple and more complex tasks. The ALJ further found that Plaintiff could access social media, go outside, spend time with others, shop, and attend medical appointments.

The ALJ next considered whether the paragraph C[6] criteria were satisfied. The ALJ noted

---

[6] "Paragraph C of listings 12.02, 12.03, 12.04, 12.06, and 12.15 provides the criteria we use to evaluate "serious and persistent mental disorders." To satisfy the paragraph C criteria, your mental disorder must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2 (see 12.00G). (When we refer to "paragraph C" or "the paragraph C criteria" in

that Plaintiff could attend to personal care, perform some household chores, read, use a computer, access social media, attend medical appointments, go shopping, and spend time with others. The ALJ observed that Plaintiff had the ability to babysit the eight-year-old son of a friend. The ALJ determined that Plaintiff's abilities demonstrated a significant ability to respond to environmental changes and new mental demands. Finally, the ALJ noted that no state agency psychological examination concluded that a mental listing is medically equaled. R. 20-22.

Next, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following exceptions:

> The claimant can perform no lifting, carrying, pushing, or pulling over 20 pounds occasionally and ten pounds frequently. She can stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. She can perform no more than frequent overhead reaching with the bilateral upper extremities, and no more than frequent handling or fingering with the bilateral upper extremities. The claimant can perform no more than frequent balancing or climbing of ramps and stairs. She can perform no more than occasional stooping, kneeling, crouching, crawling, and climbing of ladders, ropes, or scaffolds. She can have no more than occasional exposure to hazards such as unprotected heights and moving mechanical parts. The claimant can no more than occasionally operate a motor vehicle. The claimant is limited to work in a low-stress environment, meaning she is limited to simple, routine, and repetitive tasks and simple work-related decisions; is not required to meet a rigid, inflexible production schedule or make complex decisions; and there are no more than occasional changes in a routine work setting and any such changes should only be gradually introduced. However, she is able to maintain concentration, persistence, or pace for periods of two hours, perform activities within a schedule, maintain regular attendance, and complete a normal workday and workweek The claimant can have no more than occasional interactions with the general public, and no more that occasional, close "team-type" interactions with coworkers.

R. 22.

---

the introductory text of this body system, we mean the criteria in paragraph C of listings 12.02, 12.03, 12.04, 12.06, and 12.15.)" Appendix 1–Part–A2. to Subpart P of Part 404–Listing of Impairments.

In considering Plaintiff's symptoms, the ALJ recounted the information available in the initial Disability Report, Plaintiff's most recent Function Report, and information provided at the hearing. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce some of Plaintiff's symptoms. The ALJ determined, however, that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. After summarizing the medical evidence, the ALJ gave some weight to the opinions of Dr. Altieri. Dr. Altieri opined that Plaintiff could not maintain gainful employment due to the physical and cognitive effects of fibromyalgia. The ALJ gave some weight to the postural and manipulative limitations reported by Dr. Altieri, but found that the medical evidence, including Dr. Altieri's own treatment notes, did not support the degree of physical limitation endorsed by Dr. Altieri. The ALJ also noted that Plaintiff did not report significant problems sitting and indicated she could lift and carry twenty pounds throughout the day. *Id.* at 36.

The ALJ gave little weight to the opinions of Dr. Riddle. The ALJ found that Dr. Riddle's opinions were not consistent with the balance of the evidence. The ALJ noted that Plaintiff had longstanding mental health symptoms, with little indication that they worsened around or after the alleged onset date. The ALJ noted that Plaintiff had some work history; the presence of mental health symptoms, but not to the severity described by Dr. Riddle; and that Plaintiff was able to attend to personal care, perform some household chores, read, use a computer, access social media, shop in stores, attend medical appointments, socialize with friends, and babysit. *Id.* at 26.

The ALJ gave little weight to the opinions of Dr. Taylor. The ALJ noted that the opinions were based on a one-time evaluation of Plaintiff, and the opinions were not consistent with

Plaintiff's history of multiple impairments. *Id.* at 27. The ALJ also gave little weight to the opinions of Drs. Cochran and Walker. The ALJ noted that Drs. Cochran and Walker were nonexamining medical sources who did not have the opportunity to consider the entire record. *Id.* In addition, the ALJ gave little weight to the opinions of Drs. McWilliams and Hammonds. The ALJ stated that, like Drs. Cochran and Walker, Drs. McWilliams and Hammonds were nonexamining medical sources who did not have the opportunity to review the entire record.

The ALJ gave little weight to Plaintiff's GAF scores. The ALJ determined that the GAF score represented the subjective opinion of one clinician, on one day, at a single point in time, The ALJ also noted that a GAF score is not intended for adjudicative purposes or for use in litigation and may include ratings that do not relate to holding a job. In addition, the ALJ observed that the raw numeric scores were not supported by a narrative detailing the rational for the findings of the evaluator.

The ALJ gave some weight to the statements of Plaintiff's parents, but found that the statements did not support a finding of disability. The ALJ noted that, as parents, they would have a tendency to agree with the symptoms and limitations alleged by Plaintiff. The ALJ founded that the parents' statements were inconsistent with the medical evidence. The ALJ did give some weight to the parents' statements in that the statements provided insight into Plaintiff's functioning. *Id.* at 29.

In sum, the ALJ determined that:

In light of the medical evidence and opinions, I do not find the alleged severity of the claimant's impairments to be fully consistent with the evidence. The medical record shows a long history of mental health symptoms, with little indication that they worsened within the timeframe under consideration (Exhibits 2F; 11F). Although the claimant required some inpatient psychiatric, most of her treatment was

conservative in nature, involving psychotherapy and prescriptions for psychotropic medications (Exhibits 7F; 9F; 11F; 14F). Treatment notes shows reasonably good response to medications, with some indications of improper use of medication. The psychological consultative examination performed by Dr. Taylor did not confirm the symptom severity described by the claimant at the hearing (Exhibit 8F). During the evaluation, the claimant seemed pleasant and cooperative. Moreover, she completed assigned tasks and received a perfect score on the Folstein MMSE, a test of mental cognition. Neither of the state psychological evaluators who reviewed the available record endorsed the degree of mental limitation alleged by the claimant (Exhibits 2A/10-11; 5A/11-13).

*Id.* at 29 (errors in original).

The ALJ determined that Plaintiff had no past relevant work. The ALJ discounted Plaintiff's job as a pizza delivery driver because the record did not definitively establish countable earnings above the threshold for substantial gainful activity. The ALJ also determined that, even if Plaintiff's job as a pizza delivery driver were to be considered past relevant work, it would be precluded by the RFC identified by the vocational expert as well as the ALJ's opinion. *Id.* at 31.

Finally, the ALJ found that jobs exist in the national economy for individuals with Plaintiff's age, education, work experience, and RFC, as testified to by the vocational expert. The ALJ concluded that Plaintiff was not under a disability from May 5, 2013, through the date of his decision. Accordingly, the ALJ denied Plaintiff's application for a period of disability and disability insurance benefits. *Id.* at 31-32.

D.    The Report and Recommendation

Plaintiff argued in her brief that the ALJ failed to explain his RFC findings as required by SSR 96-8p, which provides:

1.    Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2.     The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. Age and body habitus are not factors in assessing RFC. It is incorrect to find that an individual has limitations beyond those caused by his or her medically determinable impairment(s) and any related symptoms, due to such factors as age and natural body build, and the activities the individual was accustomed to doing in his or her previous work.

3.     When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

4.     The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

5.     RFC is not the least an individual can do despite his or her limitations or restrictions, but the most.

6.     Medical impairments and symptoms, including pain, are not intrinsically exertional or nonexertional. It is the functional limitations or restrictions caused by medical impairments and their related symptoms that are categorized as exertional or nonexertional.

The Magistrate Judge determined that the ALJ supported the functional limitations found in the ALJ's RFC determination with discussion and citation to substantial evidence in the record. The Magistrate Judge noted that Plaintiff's alleged onset date was May 5, 2013, and that in May 2013 Dr. Kendall reported that Plaintiff was cheerful and had an adaptive response to losing her job; she had fair insight, good judgment, appropriate affect, intact attention, and no ideations. The Magistrate Judge also found that the ALJ's RFC properly considered the credible limitations supported by substantial evidence in the record, including Plaintiff's testimony and her function reports; her mother's testimony; treatment notes; and hospitalizations related to psychiatric problems and drug

overdoses. The Magistrate Judge recounted the ALJ's reliance on medical reports that Plaintiff was reasonably responsive to treatment, counseling, and medications, as well as Dr. Taylor's consultative examination. The Magistrate Judge noted the ALJ's reasoning for giving little weight to Dr. Riddle's opinions, in part because when Plaintiff was working she experienced similar mental health symptoms as those described by Dr. Riddle as serious, extensive limitations.

Plaintiff next argued that the ALJ failed to properly weigh Dr. Riddle's medical opinions, as required by former 20 C.F.R. § 404.1527(c).[7] Pursuant to 20 C.F.R. § 404.1527(c),

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>
> (i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen

---

[7] The provisions of 20 C.F.R. § 404.1527(c) were revised after the date of the ALJ's decision.

by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.© How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless

we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The Magistrate Judge determined that the weight assigned to Dr. Riddle's opinions was based

on "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

ECF. No 31, 43 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Magistrate Judge

found that the ALJ had properly analyzed the Dr. Riddle's opinions and determined they were not

consistent with the evidence of record and not entitled to controlling weight.

Plaintiff next asserted that the ALJ erred in his subjective symptom evaluation. The ALJ's

evaluation was guided by prior SSR 16-3, which provided, in relevant part:

Consideration of Objective Medical Evidence

Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities for an adult[.] We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.

    . . . .

Consideration of Other Evidence

If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations. . . .

    . . . .

An individual's statements may address the frequency and duration of the symptoms,

38

the location of the symptoms, and the impact of the symptoms on the ability to perform daily living activities. An individual's statements may also include activities that precipitate or aggravate the symptoms, medications and treatments used, and other methods used to alleviate the symptoms. We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.

. . . .

Other sources may provide information from which we may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms. Examples of such sources include public and private agencies, other practitioners, educational personnel, non-medical sources such as family and friends, and agency personnel. We will consider any statements in the record noted by agency personnel who previously interviewed the individual, whether in person or by telephone. The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.

. . . .

In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3). These factors include:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

The Magistrate Judge determined that the ALJ thoroughly discussed Plaintiff's records in

support of his evaluation, as set forth in the Magistrate Judge's earlier analysis with respect to RFC

and opinion issues. Accordingly, the Magistrate Judge determined that the ALJ conducted the proper evaluation of subjective symptoms and cited substantial evidence to support his finding that Plaintiff's allegations of symptom severity and limitations were not entirely consistent with the record.

Finally, Plaintiff argued that substantial evidence did not support the ALJ's finding that work existed in significant numbers in the economy because the RFC conflicted with the jobs identified by the vocational expert.  The Magistrate Judge noted that the jobs identified by the vocational expert–office helper; inspector and hand packager; and marker or tagger, each has a GED reasoning level of 2.[8]  According to Plaintiff, the ALJ failed to elicit an explanation from the vocational expert of the apparent conflict between a reasoning level of 2, which requires an ability to understand detailed instructions, and Plaintiff's RFC of simple, routine work.[9]  The Magistrate Judge noted that in *Lawrence v. Saul*, 941 F.3d 140 (4th Cir. 2019), the Court of Appeals for the Fourth Circuit determined that there exists no inconsistency between an RFC of "simple, routine repetitive tasks of unskilled work" and a reasoning level of 2.  The Fourth Circuit held:

> To begin with, detailed instructions are, in the main, less correlated with complexity than with length. Instructions often include many steps, each of which is

---

[8] Pursuant to Appendix C - Components of the Definition Trailer (Dictionary of Occupational Titles), a GED reasoning level of 2 requires the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations."

[9] Under SSR 00-4p, "before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and Explain in the determination or decision how any conflict that has been identified was resolved."

straightforward. Driving directions are a good example: they may prescribe many turns, but the turns are generally easy to make, and the route rarely changes, making the directions simple, routine, and repetitive. Further, there is no conflict between "simple" and "uninvolved" instructions, as both connote instructions that "are not complicated or intricate." *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) (citing Webster's Third New Int'l Dictionary 1191, 2499 (2002)). Finally, "routine" and "repetitive" tasks may involve a few variables, just as driving directions may vary if a road is closed.

*Lawrence*, 941 F.3d at 143-44.

Based on *Lawrence*, the Magistrate Judge determined that the ALJ did not err in failing to seek an explanation from the vocational expert, because no conflict existed.

For all these reasons, the Magistrate Judge found that the ALJ's decision was based on substantial evidence. The Magistrate Judge therefore recommended that the Commissioner's decision be affirmed.

E.    Plaintiff's Objections

Plaintiff first contends that the Magistrate Judge erred in agreeing with the ALJ that Plaintiff's health condition did not worsen around or after the time of the alleged May 5, 2013 onset date. Plaintiff notes that the record shows Plaintiff was very anxious and irritable on July 18, 2013 (R. 694-696); had significant anxiety in September 2013 (R. 693); was placed in soft restraints at an emergency room in December 2013 (R. 733-735); was found unresponsive after an overdose in February 2014, (R. 729, 688); and had another overdose in March 2014 (R. 497). However, Dr. Altieri observed that Plaintiff's had a history of multiple suicide attempts and polysubstance abuse. Ms. Johnson reported that Plaintiff had been known to be transported by ambulance for overdoses of opiate and/or benzos, and for having unlabeled bottles of morphine sulphate that were not prescribed to her. Plaintiff herself reported that she had experienced approximately six or seven

psychiatric hospitalizations between the early 1990s and 2009 for manic-depressive episodes and suicide attempts. The administrative record contains treatment notes from at least 2006 documenting a history of anxiety, low motivation, sleeplessness, and thoughts of self-harm. During all this time, the records also show that Plaintiff had periods of calm, good response to medications, and the ability to communicate appropriately with evaluators. The Magistrate Judge did not err in finding the ALJ relied on substantial evidence to determine Plaintiff's condition did not worsen after the alleged onset date. Plaintiff's objection is without merit.

Plaintiff next asserts that the Magistrate Judge erred in finding that the ALJ properly considered the evidence, including treatment notes that showed no suicidal ideation. Plaintiff states that a lack of suicidal ideation does not equate to an ability to work; that the ALJ and Magistrate Judge cited to numerous records from prior to the onset date; and that the ALJ failed to show how three records from the relevant time period showing no suicidal ideation are worthy of more weight than the records from February and March of 2014 documenting drug overdoses. Similarly, Plaintiff asserts that the Magistrate Judge erred in finding the ALJ properly considered evidence that, even though Plaintiff had symptoms of emotional volatility, irritation, and lack of insight at times, such symptoms did not establish she was unable to function because of her symptoms.

There is no dispute that Plaintiff's mental impairments would wax and wane. Plaintiff would have the adjudicator focus solely on Plaintiff's periods of emotional volatility and not the overall record. The record also demonstrates that Plaintiff could perform activities of daily living; she was generally alert and oriented to time, place, and day of the week; and articulated good insight and judgment. The ALJ also observed that Plaintiff generally was treated conservatively, was able to use a laptop, and could babysit without supervision. The ALJ evaluated all the relevant mental health

evidence, assigned no or little weight to medical opinions that Plaintiff was not disabled, and took into account Plaintiff's impairments in determining her residual functional capacity. For the reasons shown herein and in the Report and Recommendation, the court concludes that the ALJ performed an adequate review of the entire record and thoroughly explained his reasons for finding no disability. Plaintiff's objection is without merit.

Plaintiff also contends that the ALJ failed to explain how Plaintiff could maintain concentration, persistence, and pace for periods of two hours. The court notes that Dr. Riddle's evaluation appears to have established the basis for the ALJ's hypotheticals. The two-hour limitation was taken into consideration by the vocational expert when explaining whether jobs existed in the economy that would meet the ALJ's restrictions regarding Plaintiff's ability to perform.

Plaintiff further asserts that the ALJ failed to adequately explain the meaning of "a rigid, inflexible production schedule" in the RFC findings. However, this terminology is commonly recognized as referring to a low stress environment. *See, e.g., Adams v. Berryhill*, Civil Action No. 6:16-1721-TLW-KFM, 2017 WL 4048385 (D.S.C. July 11, 2017); *Yarbrough v. Berryhill*, Civil Action No. 8:15-cv-04930-RBH-JDA, 2017 WL 521636 (D.S.C. Jan. 30, 2017); *Cherry v. Colvin*, Civil Action No. 2:14-2620-MGL, 2015 WL 4459252 (D.S.C. July 20, 2015); *Edmond v. Colvin*, Civil Action No. 8:12-cv-1081-RMG-JDA (D.S.C. July 29, 2013). The court concludes that the ALJ was not required to explain the meaning of "a rigid, inflexible production schedule" to the vocational expert in order for the vocational expert to provide meaningful testimony.

Plaintiff argues that the ALJ did not perform the proper function-by-function analysis as set forth in *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019)(finding that a proper RFC analysis has three components: evidence, logical explanation, and conclusion). In this case, as set forth in detail

hereinabove and in the Report and Recommendation, the ALJ meticulously reviewed the evidence and provided a narrative explaining how he arrived as his conclusions, as required by SSR 96-8p. The ALJ did not move directly from the evidence to his conclusions without analysis. The ALJ took Plaintiff's limitations into account when assessing Plaintiff's RFC. Plaintiff points to no specific alleged weakness in the ALJ's analysis. Plaintiff's objection is without merit.

Next, Plaintiff asserts that the Magistrate Judge erred in upholding the ALJ's assignment of little weight to the opinions of Dr. Riddle. Plaintiff claims that the Magistrate Judge improperly repeated the ALJ's reasoning that Dr. Riddle's assessment was not consistent with the evidence. Plaintiff argues that the evidence cited by the Magistrate Judge and ALJ confirms, not detracts, from Plaintiff's inability to reasonably function on a consistent basis. As the ALJ noted, Plaintiff had longstanding mental health symptoms, but was able to earn approximately $10,000 during several years of her work history; that treatment notes confirm the presence of mental health issues but not to the level of severity described by Dr. Riddle; and that Plaintiff's activities of daily living were not consistent with the limitations identified by Dr. Riddle. The court finds that the ALJ adequately explained why he did not adopt Dr. Riddle's opinions. Plaintiff's objection is without merit.

Plaintiff argues that the Magistrate Judge failed to fully address Plaintiff's concerns that the ALJ did not consider all of the evidence in finding her reported symptoms were inconsistent with the evidence. As noted previously, the ALJ recounted in detail evidence in the record, including records showing Plaintiff's periods of decompensation, and in several circumstances gave Plaintiff the benefit of the doubt regarding the severity of her impairments. As noted, it is not within the court's authority to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ. Plaintiff's objection is without merit.

The court concludes that the record as a whole contains substantial evidence to support the ALJ's findings.

## IV.  CONCLUSION

The court concludes that the ALJ's findings are supported by specific references to the evidence upon which the ALJ bases his decision.  *See See v. Washington Metro. Area Transit Auth.*, 36 F.3d 375, 384 (4th Cir. 1994).  Plaintiff has not demonstrated that the evidence is insufficient for "'a reasonable mind [to] accept [the ALJ's] conclusion[s].'"  *McCarney v. Apfel*, 28 F. App'x 277 (4th Cir. 2002) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Even if the court would have reached a different decision, it must nonetheless defer to the conclusions of the ALJ if such conclusions are bolstered by substantial evidence and were reached through a correct application of relevant law.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.1987).  Accordingly, the court adopts the Report and Recommendation and incorporates it herein by reference.  For the reasons stated herein and in the Report and Recommendation, the Commissioner's decision is **affirmed**.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

April 20, 2020